## ELMER V. ERICKSON v. STAFFORD KING AND OTHERS.[1]

July 7, 1944.

No. 33,874.

[1]Reported in 15 N. W: (2d) 201.

*Cummins & Cummins,* for appellant.

*J. A. A. Burnquist,* Attorney General, and *William C. Green,* Assistant Attorney General, for respondents.

LORING, CHIEF JUSTICE.

This is a taxpayer's suit to restrain the state auditor and the governor from carrying out the provisions of L. 1943, c. 500, authorizing the creation of a Metropolitan Airports Commission, on the ground that it violates Minn. Const. art. 9, §·5, providing that "the state shall never contract any debts for works of internal improvements, or be a party in carrying on such works," and art. 4, § 33, and art. 9, § 1, in that it attempts to authorize public taxation for a private purpose, and lend the credit of the state in aid of a corporation in contravention of art. 9, § 10. The trial court sustained a demurrer to the complaint. The appeal is from that order.

Chapter 500 is entitled:

"An act relating to public airports, providing for the organization and administration of public corporations for acquiring, establishing, developing, maintaining, controlling, and operating such

airports, and for financing the operations of such corporations, and those of other municipalities owning and operating airports, and appropriating moneys therefor."

It provides for the creation in and for any two contiguous cities of the first class of a public corporation to be known as the "Metropolitan Airports Commission" of those cities. The corporation is given jurisdiction over airports within contiguous cities of the first class, and authority to exercise control and jurisdiction over any other airport within 25 miles of the city hall of either city if it so determines. It is granted the power of eminent domain, of making rules, regulations, and ordinances, and the power to enforce them. An appropriation is made for the survey of existing airports in the cities involved and for the formulation of plans for the expansion and operation by the corporation of existing airports and the acquisition and construction of new airports.

Upon completion of its permanent plan of operation, the corporation is directed to take over the use, management, operation, regulation, policing, and control of any or all airports owned by either city and to exercise the powers granted to it by the act. The corporation, now known as the Minneapolis-St. Paul Metropolitan Airports Commission, is completely organized and engaged in carrying out the purposes of c. 500.

The corporation's operations are to be financed from income, by bonds, and from such parts of appropriations provided for in the act as may be allocated to it by the governor at its request, and by moneys paid to it by the cities involved in proportion to the assessed valuation of each. The corporation may compel the county auditors of the counties within which such cities lie to extend a levy of taxes for the support of the corporation in case the commissioners fail to certify to the county auditors the amount required to be raised by the cities. The corporation may issue bonds not to exceed $15,000,000 in amount, to be secured by the full faith, credit, and resources of the cities for which the corporation is created. In addition to the direct appropriation for the survey and preliminary plans, the act directs the state auditor to levy,

upon all taxable property of the state, taxes sufficient to produce the sum of $100,000 for each of ten taxable years, and, upon request of the governor, the state auditor is directed to sell certificates of indebtedness of the state as funds are needed for the purposes of the act, but not to exceed $1,000,000 in the aggregate.

The governor has requested the sale of certificates in the sum of $75,000. The proceeds of the authorized taxation and bonds are to be covered into a Minnesota Metropolitan Airports Fund established in the state treasury for the purposes of the act. Out of this fund, there is appropriated to the governor for the purposes of the act the sum of $1,000,000 for the biennium ending June 30, 1945. The act contains authority for the issuance of bonds, which shall be deemed and treated as instrumentalities of a public governmental agency and, as such, exempt from taxation, as is all property of the corporation. The state treasurer is *ex officio* the treasurer of the corporation. Provision is made for payments to the treasurers of Minnesota municipalities maintaining airports which further the objectives of the act.

The members and governing body of the corporation consist of the mayor of each of the cities, or a voter appointed by him; a member of the council of each such city appointed by the council; a member of the board of commissioners having jurisdiction at the time of the passage of the act of airports of each of the cities, appointed by such board; a nonoffice-holding freeholder of each city who has resided therein at least ten years; and one voter of a noncontiguous county, who shall be appointed by the governor and shall be chairman of the corporation.

The act declares that its purposes are public and governmental; that the establishment of the airport systems thereby created will promote the public safety and welfare of the state; and that the acquisition, construction, development, extension, maintenance, and operation of such airport systems are essential to the development of air navigation and transportation in and through this state and to the national defense during the present war and in the prosecution thereof. The corporation is not organized for profit,

and its receipts may be used only for carrying on its activities and the payment of its bonds.

■ The principal challenge to the constitutionality of the act is that thereby the state contracts a debt for works of internal improvement and becomes a party to the carrying on of such works in contravention of Minn. Const. art. 9, § 5. This provision of the constitution has been consistently held by this court not to apply to works which are used by the state as a sovereign in the performance of its governmental functions. Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857; Berman v. Minnesota S. A. Society, 93 Minn. 125, 100 N. W. 732; State ex rel. Smith v. Van Reed, 125 Minn. 194, 199, 145 N. W. 967, 968; Lipinski v. Gould, 173 Minn. 559, 218 N. W. 123.

■ We take judicial notice of the distinction between traffic by rail, highway, and canal and air traffic as it has developed, is developing, and is reasonably certain to develop within the foreseeable future. Smith v. New England Aircraft Co. 270 Mass. 511, 519, 170 N. E. 385, 388, 69 A. L. R. 300, 306.

■ The position of the attorney general is that the corporation is but an instrumentality of the state created to carry on its sovereign governmental functions. The plaintiff, relying largely on Cooke v. Iverson, 108 Minn. 388, 122 N. W. 251, 52 L.R.A.(N.S.) 415, which held that appropriation of state funds for the improvement of free public highways offended art. 9, § 5, contends that c. 500 is an exercise of the state's proprietary functions as distinguished from its sovereign governmental functions. We examine the enactment to discover in which capacity it functions. In our quest for light we are not much helped, either by our own previous decisions or by those of other states. For instance, Cooke v. Iverson, *supra,* considered a statute addressed solely to the physical improvement of highways. Had the appropriation there involved been for the purpose of the control and policing of traffic by highway, we apprehend that the court would have found little difficulty in sustaining it, even to the extent of establishing control stations or any other means of patrolling or policing traffic. Such would

have been very obviously the exercise of the police power in the sovereign aspect of government.

A reading of the debates in the constitutional convention or conventions which framed our constitution leads us to believe that the evil sought to be prevented by that part of art. 9, § 5, now under consideration was that of the state's financing railroads, toll roads, or canals, all of which lend themselves readily to operation for profit by private corporations and are not well carried on by public officers. Ryerson v. Utley, 16 Mich. 269; People ex rel. Bay City v. State Treasurer, 23 Mich. 499. Were the question involved in Cooke v. Iverson up for decision today as a matter of first impression, it is doubtful whether there would be such broad expressions as were there used in discussing the scope of the prohibition contained in art. 9, § 5. The decision seems to rest in large measure upon other constitutional provisions relating to public highways (art. 4, § 32b, and the amendment of 1898 to art. 9, § 16) and upon a practical construction of long standing by the legislature in refraining (with one exception in 1868) from appropriating state funds for roads and bridges. The court conceived that these factors clearly brought highways specifically within the ban of art. 9, § 5. For these reasons, the court did not consider the well-established implied exception to art. 9, § 5, in favor of improvements made in furtherance of governmental, as distinguished from proprietary, functions. Consequently, that decision established no principle controlling improvements other than highways. State ex rel. County of Morrison v. Babcock, 161 Minn. 80, 200 N. W. 843, merely followed Cooke v. Iverson as to roads.

Maryland and Nebraska apparently did not have the same constitutional provisions which moved the court in Cooke v. Iverson. Those states held that the improvement of public highways did not violate a constitutional provision similar to art. 9, § 5. Bonsal v. Yellott, 100 Md. 481, 60 A. 593, 69 L. R. A. 914; State v. Bone Creek Township, 109 Neb. 202, 190 N. W. 586, 193 N. W. 767. See, also, Abbott v. City of Des Moines, 230 Iowa 494, 298 N. W. 649, 138 A. L. R. 120.

The hazards created by the use of airports by various types of planes, those engaged in casual flights as well as in scheduled trips for the carriage of freight, express, and passengers; the necessity for the control and safety of planes in foul weather as well as fair; the development of instrument flying and landing; the necessity for integrated control of radio beams, and even the reasonably certain future necessity for the designation of stratified altitudes for flights in specified directions, all call for unified control. The establishment of adequate terminals and facilities for the control of such traffic is far beyond the capacity of private enterprise. The necessity for a unified, integrated, centralized system of control of all classes of aerial traffic in the common "air ocean" above the state, as a safety measure, calls for centralized control by the state government functioning in its sovereign capacity. That power of control is subject only to the constitutional powers of congress over interstate traffic, post roads, and national defense and the general welfare. Otherwise, the state has not only the jurisdiction to control air traffic above the territory within its boundary, but the responsibility of a sovereign to protect such traffic and its passengers and freight. As well said by the supreme court of Massachusetts, speaking through Mr. Chief Justice Rugg:

"* * * It is essential to the safety of sovereign States that they possess jurisdiction to control the airspace above their territories. It seems to us to rest on the obvious practical necessity of self-protection. * * * That power extends * * * to the regulation of passage through the air of all persons in the interests of the public welfare and the safety of those on the face of the earth. * * *

* * * * *

"* * * It is the proper function of the legislative department of government in the exercise of the police power to consider the problems and risks that arise from the use of new inventions and endeavor to adjust private rights and harmonize conflicting interests by comprehensive statutes for the public welfare." Smith v. New England Aircraft Co. Inc. 270 Mass. 511, 521, 523, 170 N. E. 385, 389, 390, 69 A. L. R. 300, 308, 309.

In this connection, we cannot ignore the public necessity for military traffic and facilities for the training and control of pilots for the armed services, as well as for the possible protection which may become necessary in this or future wars. To this may be added the use of aircraft in patrolling our forests.

On these facts, was it unjustifiable for the legislature to conclude that regulation of private enterprise would not achieve the control necessary to police the air and that it must provide a governmental corporate instrumentality to own and control all airports in a metropolitan area, or to provide for a state-wide system of such ports to function in harmony with the metropolitan system? We think not. The safety of the traffic demands centralized control, management, and operation, which becomes as much a sovereign function as the policeman at the intersection or the patrolman on the highway.

As well said by the trial court:

"Aerial travel is not confined to roads, rails, rivers or canals. It can proceed in or come from all directions. Extraordinary and unique provisions must be made for safeguarding the traffic as it approaches the port from all directions. Constant contact and communication with all parts of the country must be maintained for weather reports and indications. Any metropolitan center such as the Twin Cities, where airships almost as large as an ocean liner, with a spread of wings of one hundred feet or more may be expected at any time, many miles of surface must be provided for runways and landing facilities. * * * The nature of air traffic is such that the hazards incident to taking off, flight, landing, servicing and all the other air navigation problems connected with providing prompt, dependable, adequate and safe airport facilities cannot be left to individual and private enterprise and initiative with due regard to the public welfare."

Examining the provisions of c. 500, we discern its paramount purpose to be integration of the control of air traffic in the interest of public safety, not only as to the traffic but as to the people of

the state. Subject to the constitutional powers of congress, the state government is responsible to the people for the exercise of its police power in such manner that the public welfare is best served.

In the matter of the aid which may be extended to other cities for their airports, the governor must first ascertain that such aid will be in furtherance of the governmental purposes of the act. In fact the announced purposes of the legislature must be read into all provisions of the act and the law so interpreted. In trite phrase, the act must be taken by its four corners and read as a whole. The activation of its provisions must be governmental or incident thereto.

Much emphasis was placed by plaintiff on the power conferred upon the corporation by § 7, subd. 15, of the act, to lease property under its control, except municipal airports taken over by it. However, this power is strictly circumscribed and held within such purposes as will further the interests of aeronautics. The restriction should be interpreted in the light of other parts of the act which define its purposes to be governmental. This will not exclude leasing of ordinary concessions, since those are but incidental to the main operation.

In City of Toledo v. Jenkins, 143 Ohio St. 141, 54 N. E. (2d) 656, 663, an airport case, the court said:

"That the use of essential public utility property in the operation of the utility is a public use cannot be gainsaid. See, City of Toledo v. Hosler, Treasurer, 54 Ohio St. 418, 43 N. E. 583. A ticket office, waiting rooms, baggage rooms, storage space, administrative offices, light control, dining rooms, facilities for repairs and the furnishing of gasoline are necessary to a complete public utility airport unit. Then, too, aviation in a particular area must find its center in some airport. Public utilities are created to render service to the public and for the service a charge is made. Any incidental use allied to the main public purpose is likewise public. Renting space in buildings to others to promote aviation by extending service at the airport to all the public using its facilities

would be a use incidental to the main public purpose. Moreover, the mere fact that revenue is received for the space so rented does not change the public aspect, so long as the purpose of the utility is subserved and the objective is not primarily to obtain revenue. *It is the 'primary and principal' use that controls and the fact that incidental revenue is derived from the property does not in and of itself alter the public character of the use* to which the property is put." (Italics supplied.)

The same may well be said of the distinction between proprietary and governmental functions. Brush v. Commr. of Int. Rev. 300 U. S. 352, 372, 57 S. Ct. 495, 501, 81 L. ed. 691, 699, 700, 108 A. L. R. 1428, 1436.

■ What we have said in regard to the governmental purposes of c. 500 answers plaintiff's challenge to its constitutionality on the ground that it authorizes taxation for a private purpose in contravention of art. 4, § 33, and art. 9, § 1.

■ Nor is there merit in the assertion that the act authorizes a loan of state credit in aid of a corporation in violation of art. 9, § 10. The determination that the corporation is merely an instrumentality created by the state to exercise a governmental function brings it within a similar implied exception to § 10 that there is in favor of government instrumentalities in regard to art. 9, § 5.

Order affirmed.