STATE EX REL. ANOKA COUNTY AIRPORT PROTEST
COMMITTEE v. MINNEAPOLIS-ST. PAUL
METROPOLITAN AIRPORTS
COMMISSION.

78 N. W. (2d) 722.

September 11, 1956—No. 36,926.

*Hall, Smith & Hedlund,* for appellant.

*Montreville J. Brown, Benno F. Wolff, Oppenheimer, Hodgson, Brown, Baer & Wolff,* and *Joseph Bright,* Assistant Attorney General, for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order of the District Court of Ramsey County quashing a writ of certiorari issued to review an order of the Metropolitan Airports Commission hereinafter described.

The Metropolitan Airports Commission is a public corporation created by L. 1943, c. 500. The corporation has jurisdiction over airports within contiguous cities of the first class and is given authority to exercise control and jurisdiction over any airport within 25 miles of the city hall of either city if it so determines. The nature of the corporation is more fully described in Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, and will not be repeated here except insofar as it is necessary to present the issues now before us.

The commission owns and operates Wold Chamberlain Field in Minneapolis and Holman Field in St. Paul. Wold Chamberlain Field is the major airport for the metropolitan area.

During the year 1947, proceedings were commenced for the purpose of acquiring additional land for another airport. A hearing was held from October 15, 1947, to and including November 5, 1947, entitled "In the Matter of the Selection of a Site for the Major Air Terminal for the Area, known as the Minneapolis-Saint Paul Metropolitan Area, the acquisition of land therefor and the development thereof."

Following such hearing and on February 11, 1948, the commission made and filed findings and an order under which it designated Wold Chamberlain Field as the major passenger terminal airport for the metropolitan area. The commission ordered the acquisition

of lands lying within said metropolitan area in the vicinity of the then tentatively designated Anoka County site, such lands to be located within either Anoka County or Ramsey County, or partly within each, in such acreage and in such exact location as might be deemed best to insure against the possible need in the future of an additional airport for said metropolitan area.

Thereafter, following a public hearing, the commission, on May 8, 1950, made and filed an order that 1,200 acres of land situated in Anoka County, for all practical purposes equidistant from the city halls of the cities of Minneapolis and St. Paul, be acquired to insure against possible need in the future for a major airport for said metropolitan area in addition to Wold Chamberlain Field and that, upon the acquisition of said lands, the commission proceed to construct, maintain, operate, and develop thereon a secondary airport, subject to the consummation of arrangements with the University of Minnesota for the transfer of its airport and facilities to such new site.

Most of said 1,200 acres have been acquired by the commission, and the commission has constructed a secondary airport thereon and is now, and has been for approximately three years, maintaining and operating the same as a secondary airport, which has been designated as the Anoka County Airport. Arrangements were made with the University of Minnesota under which its airport facilities were moved to and installed at the Anoka County Airport. The airport has been operated as a class 3 airport and is equipped with a paved runway 3,700 feet long, with a parallel taxiway, a parking apron adjacent to which are some administrative buildings and hangars, two landing strips, and other facilities. The university's facilities at the airport are maintained and operated by the university for instruction and training in flying and for instruction generally in the field of aeronautics. The university's facilities consist, generally speaking, of an administration building and hangar, with the usual equipment to be found in such building.

The Minnesota National Guard, an agency of the State of Minnesota, has been in existence for many years. In 1920, in keeping

with the development of the air arm as an integral part of the military establishment, the Minnesota Air National Guard was organized as a branch of the Minnesota National Guard. A squadron known as the 109th Squadron constitutes one of the units of said branch. This squadron was recognized by the Federal government in 1921 and has been supported by Federal, as well as state, funds since that time. The squadron was mobilized for fighting in both World War II and the Korean war.

The 109th Fighter Interceptor Squadron of the Minnesota National Guard is now equipped with propeller-type aircraft which have become obsolete, and if the squadron is to be kept intact in Minnesota, it is necessary that it be equipped with jet-propelled aircraft and that a field suitable for landing and takeoff of such aircraft be provided.

The 109th Squadron is stationed at and has operated from Holman Field in St. Paul for approximately 20 years. Holman Field, by virtue of the size, terrain, and location of obstructing buildings, is not capable of accommodating jet-propelled aircraft, nor can it be made so. Unless the guard can locate the 109th Squadron and its activities, including the necessary operation of jet-propelled aircraft, at an airport within the metropolitan area of Minneapolis and St. Paul, the state stands to lose the squadron, since there is no other community in the state having the necessary reservoir of professional and technical personnel to support such an organization.

Much of the facts stated above has been taken from the findings of the commission, to which no exception has been taken.

Confronted with this situation, the officers in charge of the Minnesota National Guard, and particularly the 109th Fighter Interceptor Squadron, began negotiations with the commission for procuring a suitable site for the operation of the squadron. With that object in mind, the commission, on March 2, 1954, conducted a public hearing looking toward the acquisition of additional land and the expansion of its facilities at the Anoka County Airport so as to make it available and suitable for the use of the 109th Squadron in the operation of jet-propelled planes of the type known as F-94. On April 19, 1954,

the commission issued its order granting to the Minnesota National Guard permission to use the Anoka County Airport and ordering the acquisition of additional land and the expansion of its facilities so as to make it suitable for that use. Thereafter relator, Anoka County Airport Protest Committee, which consists of a corporation formed by property owners in the vicinity of the Anoka County Airport who are opposed to the expansion of these facilities, procured a writ of certiorari issued out of the District Court of Ramsey County challenging the proceedings taken by the commission. After a hearing before the court, certain parts of the proceedings were approved and other parts disapproved. The court was of the opinion that sufficient attention had not been given to the effect which the expansion of this airport would have upon property located in the vicinity and that additional testimony should be taken concerning the density of population and the effect which the expansion would have upon such property. Thereafter, on May 17, 1955, the hearing was reopened and continued through May 20, 1955. A great deal of additional testimony was taken, particularly with reference to the density of the population in the area surrounding the airport and the effect which the expansion of this airport and its use for jet-propelled aircraft would have upon such property and the people resident therein. Following such hearing, the commission on November 7, 1955, again made findings of fact and its order, under which it was determined to proceed with the acquisition of some additional land and the expansion and installation of such runways as would be suitable for the landing and takeoff of the type of jet aircraft which the National Guard intends to use, and granted consent to the National Guard to use such airport. The matter again was brought before the Ramsey County District Court, and on February 2, 1956, that court issued its order quashing the writ of certiorari and dismissing the proceedings. Relator then appealed to this court.

Relator presents for our consideration three issues, namely (1) that L. 1943, c. 500, as amended by L. 1947, c. 363, and L. 1951, c. 72, are violative of the Federal and Minnesota constitutions and

that the acts of the commission, purportedly acting under said statutes, similarly are unconstitutional; (2) that the commission did not comply with the provisions of M. S. A. 360.124 in determining whether the Anoka County Airport should be enlarged, improved, and used by jet aircraft; and (3) that designated findings of the commission of November 7, 1955, are not supported by the evidence and that said order is not supported by the findings.

It is the contention of relator, insofar as the attack on the constitutionality of the act is concerned, (1) that, inasmuch as the residents of Anoka County have no representation on the board of the Metropolitan Airports Commission, there is such a deprivation of the rights of such residents as to constitute a violation of Minn. Const. art. 1, §§ 2 and 7;[1] (2) that the proceedings constitute a violation of Minn. Const. art. 1, § 13,[2] in depriving relator of property without just compensation; and (3) that the act creating the Metropolitan Airports Commission constitutes special legislation violative of Minn. Const. art 4, §§ 33 and 34.[3]

Relator further contends that the act and the commission's proceedings are contrary to U. S. Const. art. IV, § 4, and U. S. Const. Amends. V and XIV.

---

[1](Only those portions of our constitution which relator contends have been violated are set forth.)

Section 2. "No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizens thereof, unless by the law of the land, or the judgment of his peers."

[2]Section 13. "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

[3]Section 33. "* * * The legislature shall pass no local or special law regulating the affairs of * * * any county, city, village, township, ward or school district, * * *; granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever, * * *. *Provided, however,* That the inhibitions of local or special laws in this section shall not be construed to prevent the passage of general laws on any of the subjects enumerated."

Section 34. "The legislature shall provide general laws for the transaction of any business that may be prohibited by section one (1) of this amendment, and all such laws shall be uniform in their operation throughout the State."

The constitutionality of the act creating the Metropolitan Airports Commission has heretofore been upheld as against other attacks. In Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, we held that the act did not violate Minn. Const. art. 9, § 5.

In Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241, we held that the act was not special legislation in violation of Minn. Const. art. 4, §§ 33 and 34, and that it did not violate U. S. Const. Amend. XIV.

In State ex rel. Interstate, etc. v. M.-St. P. M. A. Comm. 223 Minn. 175, 25 N. W. (2d) 718, we held that the act was not an unconstitutional delegation of legislative power or a deprivation of private property without due process under the facts of that case.

None of those cases, however, are determinative of the constitutional question now presented.

■ Under the act, the governing body of the corporation is composed of the mayor of each of the cities involved or a qualified voter appointed by him; a member of the council of each such city appointed by the council; a member of the board of commissioners having jurisdiction at the time of the passage of the act of airports of each of the cities, appointed by such board; a nonoffice-holding freeholder of each city who has resided therein at least ten years; and one qualified voter of a noncontiguous county, who shall be appointed by the governor and shall be chairman of the corporation.

It is apparent that no resident of Anoka County or of any other county contiguous to Minneapolis and St. Paul can ever serve on the board of governors. Lack of opportunity so to serve poses the first constitutional question and probably the only one meriting any extended discussion.

If the contentions of relator were tenable, it is obvious that residents of all counties lying wholly or partly within the 25-mile radius from the city halls of Minneapolis and St. Paul are equally entitled to representation on the board even though there may be no airports now in the jurisdictional area of such counties and probably never will be. One of the difficulties with this position is that it is not the land actually taken for an airport which demands representation,

but the area surrounding it. Flight of aircraft is not confined to the 25-mile radius over which the Metropolitan Airports Commission is given jurisdiction but extends greatly beyond that area. If it could be imagined that the airport were to be moved to the most northerly point in Anoka County permissible under the 25-mile jurisdictional limit provided by the act, the people to the north of such airport would be affected by flights and landings therefrom and thereto as much as those to the south, still they would not be within the jurisdictional area. The question then arises whether those residing outside the 25-mile limit would be entitled to representation as well as those within that limit and, if so, how far north should they be considered.

At the 1943 session of the legislature, in addition to the passage of L. 1943, c. 500, which created the Metropolitan Airports Commission, the legislature enacted c. 653, which dealt largely with control of air traffic throughout other parts of the state not affected by c. 500. L. 1943, c. 653, § 9, subd. 1, provides that any municipality is authorized, separately or jointly with another municipality, through its governing body, to acquire, establish, construct, expand, own, lease, control, equip, improve, maintain, operate, regulate, and police one or more airports, *either within or without* the geographical limits of such municipality. This act was amended by L. 1945, c. 303. Section 11, subd. 1, of the amended act similarly provides:

"Every municipality is hereby authorized, through its governing body, to acquire property, real or personal, for the purpose of establishing, constructing, and enlarging airports and other air navigation facilities and to acquire, establish, construct, enlarge, improve, maintain, equip, operate, and regulate such airports and other air navigation facilities and structures and other property incidental to their operation, *either within or without the territorial limits of such municipality* and within or without this state; * * *." (Italics supplied.)

It must be assumed that, when the legislature adopted both c. 500 and c. 653 at the same session, they had in mind the establishment of a comprehensive plan for controlling air traffic not only in metro-

politan areas but throughout the state. It is significant that munici-
palities generally are given authority to acquire property, real and
personal, *either within or without the corporate limits of the munici-
pality.* If, then, a municipality may acquire property outside its
corporate limits and thereupon establish an airport under the con-
trol of its municipal authorities or such board or commission as it
may set up for that purpose, as permitted under the act, the lack
of representation by those surrounding the airport and living out-
side the corporate limits of such municipality would prevail in the
same manner as it prevails here. As a matter of fact, there is not
even a limitation on the distance from the municipality within
which it may acquire such airport as we have under L. 1943, c. 500.
Under L. 1945, c. 303, § 20, subd. 1, two or more municipalities may
act jointly, in which event they must then set up a board from in-
habitants of such municipalities to act for the municipalities in the
control of such airport. In such case, no one not an inhabitant of
the municipality involved would be represented on such board. That
situation is identical with the one existing under L. 1943, c. 500, as
far as residents outside the municipalities are concerned.

Statutes permitting municipalities to acquire land outside the
corporate limits for airport purposes now are quite common among
the states. That it is necessary to permit them to do so, if airports
are to be established at all, should require little argument. Air-
ports, by virtue of the nature of air flights, seldom can be operated
within the limits of a municipality except in the cases of large
metropolitan cities, and even then it is not possible in many cases.
The constitutionality of statutes permitting the acquisition of land
outside the corporate limits of the city has been uniformly unheld.[4]

---

[4]See, for instance, City and County of Denver v. Commissioners, 113
Colo. 150, 156 P. (2d) 101; City of Wichita v. Clapp, 125 Kan. 100, 263
P. 12, 63 A. L. R. 478; State ex rel. Walla Walla v. Clausen, 157 Wash. 457,
289 P. 61; State ex rel. Hile v. City of Cleveland, 26 Ohio App. 265, 160
N. E. 241; Silverman v. City of Chattanooga, 165 Tenn. 642, 57 S. W. (2d)
552; Kenton County Fiscal Court v. Richards, 291 Ky. 132, 163 S. W. (2d)
302; Annotation, 161 A. L. R. 746; State ex rel. Board of Aeronautics v.
Sims, 129 W. Va. 694, 41 S. E. (2d) 506.

In the final analysis, it must be kept in mind that a municipality is only a political subdivision of the state created for the purpose of performing those functions entrusted to it by the legislature acting for the people of the state as a whole. In the absence of constitutional restrictions, the legislature has power to modify, alter, or withdraw any power entrusted to a municipality.[5] It can take such powers away from one municipality and confer it on another. It may also vest in a public or quasi-municipal corporation, such as we have here, certain functions even though the territory involved in the exercise of such functions overlaps territory of other municipalities.

The very nature of air traffic is such that it demands a "unified, integrated, centralized system of control"[6] throughout the state and particularly within and near the large metropolitan areas of the state. Providing such control is a proper exercise of the state's police power. The legislature undoubtedly had in mind the necessity of setting up a separate agency to afford such unified control over the area in and around large contiguous cities of the first class constituting a single metropolitan area as far as air flight is concerned. In creating such agency, it was clearly the prerogative of the legislature to provide how such agency should be constituted. The people of Anoka County are represented in the legislature the same as all other citizens of the state. If they feel that the type of agency set up by the legislature discriminates against them, the complaint is one which should be addressed to the legislature rather than to the courts.

We see no constitutional barrier on the ground of lack of representation.

■ Relator's contention that the action of the commission violates Minn. Const. art. 1, § 7, and U. S. Const. Amends. V and XIV, in depriving citizens of property without due process of law, requires no discussion. On the record before us there is no evidence of action by the commission which would constitute a taking of property in

[5]Monaghan v. Armatage, 218 Minn. 108, 112, 15 N. W. (2d) 241, 243.
[6]Erickson v. King, 218 Minn. 98, 104, 15 N. W. (2d) 201, 204.

violation of these constitutional provisions. Apparently relator is apprehensive of the use to be made of the airport in the future. If and when the use of the operation of the airport may be such that it constitutes a taking or damage to property within the prohibition of constitutional provisions, there will be time enough to consider these questions.

■ Relator's contention that the act constitutes special legislation contrary to Minn. Const. art. 4, §§ 33 and 34, has already been answered adversely to relator in Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241. We would serve no useful purpose by repeating what we said there.

We therefore hold that on the record before us we find nothing violative of state or Federal constitutions.

■ Relator next contends that the commission failed to consider some of the matters which the legislature has specified as requirements under M. S. A. 360.124. This statutory provision reads as follows:

"In determining whether a new airport shall be acquired or established or an existing airport expanded, the corporation shall, before taking any action thereon, hold a public hearing in accordance with the procedure set forth in Laws 1947, Chapter 363.

"In determining whether a new airport shall be acquired, or an existing airport enlarged, altered, or improved, or additional facilities obtained or existing facilities abandoned or removed, and in the determination of the use of new or existing airports, the corporation shall take into consideration the adequacy of present airport facilities, the present or proposed location, size and layout, the relationship of the proposed airport to a comprehensive plan for area-wide, state-wide and nation-wide development; whether there are safe areas available for expansion purposes; whether the adjoining area is free from obstructions based upon a proper glide ration, the nature of the terrain, the nature of the uses to which the enlarged or new airport will be put, and the possibilities for future development; the need for additional space and expansion of facilities on existing airports, the needs of aviation industries generally in the area, and

the effect the creation of a new airport or the enlargement of an existing one will have upon the property in the surrounding area of said airport to be established or enlarged."

Some of these directives are more applicable to the acquisition of a new airport than to the enlargement or expansion of an existing one. The Anoka County Airport has now been established and has operated over a period of years. It is conceded by everyone that Holman Field is inadequate and cannot be made adequate for use by jet planes. Relator argues, however, that Wold Chamberlain Field is adequate to absorb that activity.

The evidence discloses that the Air National Guard averages approximately 290 takeoffs and landings per month. These activities are divided so that the bulk of the activity occurs during the end of the week. There are approximately 6.6 takeoffs and landings on Tuesdays, Wednesdays, Thursdays, and Fridays of each week. There are 13.4 takeoffs and landings on an average each Monday between 4 and 10 p. m., and the balance of activity occurs during daylight hours on Saturdays and Sundays. The total annual flight operations in which the guard normally would be involved would be less than 3,500. The commission found that Wold Chamberlain Field cannot absorb these activities without serious detriment to the efficient operation of this field and without increased hazard in the matter of airport operations in and to the field. Operations of the Air National Guard have never been conducted from Wold Chamberlain Field but have been confined to Holman Field in St. Paul, which will now be inadequate for use by the type of planes with which the National Guard must be equipped if it is to continue in operation. Whether these activities should now be transferred to Wold Chamberlain Field or to the Anoka County Field, enlarged so as to be able to accommodate such activity, is a matter involving technical judgment which the commission is better qualified to pass upon than are the courts. Obviously, the commission did consider this question and did make a determination of it. Whether we think that their decision was a wise one or not is not the question that is before us. It is not our function to substitute our judgment for

theirs. Considering the record as a whole, we find no abuse of discretion on this issue.

Similarly, the other propositions urged by relator involve determination of fact questions. It would serve no useful purpose to recite in detail the evidence on all the issues involved pertaining to the question whether or not the commission has complied with the directives of the legislature in determining the ultimate question whether the National Guard should be permitted to use the Anoka field as enlarged or whether this activity should be transferred to Wold Chamberlain Field. It is sufficient to say that we have examined the entire record, including both printed record and typewritten transcript, and are convinced that there was a sufficient compliance with the legislative directives so that the proceedings cannot be held invalid on that account.

■ Relator challenges the sufficiency of the evidence to support findings Nos. 13, 21, 28, 32, and 33 of the commission's order. These findings are as follows:

"13. The location and the proposed development of said airport substantially accord with the recommendations of the so-called Doolittle Report as to the location and layout of airports; and are also in accord with the recommendations of the Civil Aeronautics Administration with respect to location and layout of airports.

\* \* \* \* \*

"21. Said F-94 on take-off, while operating under full power and at low altitude, creates a noise nuisance to persons immediately underneath and in close proximity to the flying aircraft; but there is no evidence in the record that civilian persons have ever been physically injured by noise generated by jet aircraft. Such noise nuisance does not occur when such aircraft is at high altitudes or is in the process of landing at an airport. Such aircraft takes off and flies at rapid speed so as to reach the high operating altitudes, 20,000 feet and beyond, as quickly as possible. By reason thereof the noise nuisance when overhead at low altitudes is of very short duration so as to cause inconvenience to persons underneath but momentarily.

\* \* \* \* \*

"28. Those living in dwellings located in the area surrounding the airport enlarged as proposed, including those to the south of the airport, will not be disturbed by the noise nuisance resulting from jet aircraft operations to any appreciable extent. As to persons who happen to be beneath the flight of such an aircraft upon take-off and climb to altitude there will be disturbance, but disturbance as to such persons will be occasional and then only momentarily as hereinbefore found. As to all, generally speaking, the disturbance will be no greater than experienced by the general public with respect to the operation of aircraft, including jet propelled aircraft, within the metropolitan area of the Cities of Minneapolis and St. Paul. And hazard, if any, to the occupants of said dwellings, arising by reason of said operations will be no greater than experienced by said general public.

\*    \*    \*    \*    \*

"31. The activities of the Guard, if located at the airport, will be conducted in such manner as to cause no interference with the usual, normal operation of such churches and schools. They will go along with their activities without material interference by such activities. And said churches and schools are so located that said activities of the Guard will give rise to no greater hazard than experienced by the general public.

"32. It is within the power of the Commission to promulgate rules and regulations as to flight patterns to reduce noise nuisance and hazard in the operation of airports being operated by it, and this power will be exercised in the event conditions should ever develop at said Anoka County Airport requiring such exercise.

"33. The enlargement of the airport by the addition thereto of lands along the eastern and western boundaries thereof, as shown on Commission's Exhibits 14 and 31, and the development aforesaid as shown on Commission's said Exhibits 14 and 31 and as testified to by the witnesses heretofore referred to, and the conduct thereat of military jet aircraft activities as testified to will not result in depreciated values of lands and homes situated in the area surrounding such airport enlarged as proposed."

The so-called Doolittle report has reference to a study of airports made at the request of the President of the United States by a commission headed by General Doolittle. In that report many recommendations were made concerning the establishment and development of airports and the conditions desired with respect to location near residential areas, among other things. Particular emphasis is placed on the type of use made of an area in the form of a trapezoid lying at the end of the runways. This Doolittle trapezoid consists of an area two miles in length, commencing one-half mile from the end of the runway, which is 1,000 feet in width at the end of the trapezoid nearest the runway and 6,000 feet in width at the farthest end. It is conceded that the area within the so-called Doolittle trapezoid involved in this case at the north end of the runway presents no problems, since that area is sparsely settled. To the south the Doolittle trapezoid is quite densely settled and occupied by residential homes. There are no schools, hospitals, churches, or other places of assembly within the area or any building of such height as to constitute a hazard to flying. The objections relate principally to the noise nuisance of jet planes. The evidence shows that the prevailing winds in Anoka County are 70 percent from the north, 20 percent from the south, and the balance from the east or west. The result is that 70 to 80 percent of landings and takeoffs are to the north, where there is no problem. Jet planes cause little noise in landing, the noise being caused to a great extent in the takeoff and during the time it takes the plane to reach a high altitude. The average number of takeoffs and landings of the National Guard are set forth above. When the percentage of such landings and takeoffs to the south are applied to the average takeoffs and landings per day, it is apparent that the activity to the south will not be very extensive. The Doolittle recommendations are intended as an ideal to be approached as nearly as possible. It is doubtful that all the recommendations can be attained in any area that can be found near metropolitan centers today. We think that the evidence sustains a finding that there has been a substantial compliance with the Doolittle report and furthermore, while the Doolittle report is worthy

of careful consideration by the commission, it is not a mandatory directive as far as our statute is concerned. The same is true of the recommendations of the Civil Aeronautics Administration.

Findings Nos. 21 and 28 relate largely to the extent of the noise nuisance. We have already discussed the extent of flying to the south, and nothing further need be said concerning that matter.

The activities of the Air National Guard are conducted at times of the day when there is little likelihood of interference with schools or churches. The evidence sustains finding No. 31.

Similarly, we think that the evidence sustains findings Nos. 32 and 33. The evidence shows that air patterns are established by the National Guard and the commission so as to cause as little interference with residents beneath the approaches and takeoffs as possible. We must assume that the commission will continue to function so as to serve those on the ground as well as those in the air.

There is much evidence to show that enlargement of the airport is not apt to cause any appreciable depreciation in the values of land and homes in the area surrounding the airport. On the record before us, the evidence sustains the commission's finding that there will be no such depreciation from a use of the airport by the National Guard.

It appears to us that relator's objections are based more on an apprehension of an expanded future use of this airport than on the proposed use by the National Guard covered by the record in this case. We are not unmindful, and the commission should not be, of the rapid developments taking place in the field of aviation. Courts should not shut their eyes to facts known to all other persons. The trend clearly is in the direction of faster and larger aircraft. With increased speed and power come additional problems of protecting those below as well as providing safety for those in the air. The effect which faster and larger aircraft will have on the property of those who occupy the land below the flight pattern should not be overlooked, but at the same time we must make some allowance for the inconveniences inherent in modern living. Many modern innova-

tions have been the cause of some loss of the tranquility of primitive life. Railroads, streetcars, automobiles, large transport trucks, and now aircraft all bring with them problems of safety, noise nuisance, and many other problems and a necessary adjustment between the rights of those engaged in said traffic and the rights of those who own and occupy property adjacent to or near the scene of such activity. If we are to live in a modern society we must be prepared to make such adjustments, and it is only by striving for a fair adjustment between nuisance and convenience that all may obtain the greatest benefit of such progress. On the record before us, we are convinced that the commission acted within its powers and that the proposed use of the Anoka air field will not greatly add to the danger or discomfort of those who reside near the airport. If a further extension and use by still larger and faster planes is proposed in the future, it will be time enough then to consider the legal implications of such use. We cannot assume that the commission will be unmindful of the rights of those who will be affected by such further use of the field.

Affirmed.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.