# LEA V. BYBEE v. CITY OF MINNEAPOLIS AND OTHERS.[1]

June 14, 1940.

No. 32,557.

*Ewing & Feidt,* for appellant.

*R. S. Wiggin,* City Attorney, and *John F. Bonner,* Assistant City Attorney, for respondents.

HILTON, JUSTICE.

This is a taxpayer's suit to restrain permanently certain officials of Minneapolis from issuing $1,774,000 worth of municipal bonds. The trial court sustained a demurrer to the complaint.

The congress of the United States in August, 1937, enacted the Rivers and Harbors Act. One of the provisions authorized

[1]Reported in 292 N. W. 617.

the appropriation of money for the improvement of the Mississippi River so that the channel would be navigable within the corporate limits of Minneapolis. In March, 1940, the city council adopted a resolution requesting the board of estimate and taxation to issue and sell permanent improvement bonds in the amount of $1,774,000 to finance, among other things, "the building of new sections on existing railroad bridges and the building of lift spans in railroad bridges to provide additional clearance."

The Mississippi River is spanned within the corporate limits of Minneapolis by numerous railroad bridges owned and maintained by private railroad companies. The clearance is insufficient to permit ordinary commercial boats that might otherwise ply this part of the river to pass.

Plaintiff argues that to allow the city to sell bonds to provide funds to alter the private railroad bridges would result in *ultra vires* activity in that public money would be spent for a private purpose.

We think that the contention is sound that the purpose is private rather than public in character. This is a necessary conclusion from the proposition that if modification of the present private railroad bridges is required before commercial river traffic can proceed past them, the owners of these structures have the uncompensable and legal duty to make the requisite reasonable alterations. For the city to expend municipal funds to build proper clearances would be a use of public money to perform the duty which these private companies owe. The focal point of attention therefore must be the demonstration of these propositions.

Under an act of congress, 11 St. 166, c. 60, the state of Minnesota has concurrent jurisdiction of the Mississippi River with the federal government. Judicial notice can be taken that the Mississippi River is a navigable stream within the requirements specified in Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 A. S. R. 541. As such, it is an actual or potential artery for river traffic. In this sense it is a public

highway. The public right to free and unimpeded channels on this navigable waterway represents such a predominant interest that it cannot be impaired except in a limited number of unusual instances. A railroad spanning its bridges across a river does so under a franchise necessarily subject by implication of law to the public right to develop and make use of the waterway. The police power (of which Minneapolis, by its general welfare and other clauses, has a broad legislative grant, see Sverkerson v. City of Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944) is concerned with the public welfare as much as with safety and convenience. Social and economic regression and stagnation have often been avoided by intelligent use of the power of control afforded by the police power. If a railroad bridge once erected cannot be altered under legal compulsion, then the police power would be a nullity and the structure would be a permanent impediment to changes which sound policy dictates. A railroad company, or any other organization, creating a structure over a navigable stream does so under a franchise vulnerable to reasonable exercises of the police power. It cannot have any reasonable expectation that the *status quo* will be impervious to subsequent needed changes. More properly, it erects the span with actual or imputed knowledge that at a later period there may be a demand that the waterway should be developed for a larger class of river traffic than the natural or artificial channels allow.

Clearly, the city has the power to encourage river navigation. But in doing so it cannot perform the legal duty of private parties. For the city to modify the existing structures would relieve those in duty bound from expending their funds to meet the requirements of the city. The duty is not compensable, for it is commanded by the police power rather than under eminent domain. If the city could spend public money to make proper clearances, in principle there would be no limit. It could then undertake at public expense the performance of innumerable private duties so long as they had some incidental relation to

the public welfare. We think that prior decisions are adequate to fortify our conclusions, and to these we turn.

Initially, it must be pointed out that 1 Mason Minn. St. 1927, §§ 4662, 4663, has no application here and does not modify decisions that are here relevant. These statutes are specifically limited to dividing the cost of changes where the railroad crossing is dangerous to life and property. The present structures, so far as the record shows, are adequately safe and sufficient for the purposes for which they are being used. The change is necessary because they operate as a barrier to river traffic and therefore against the welfare of a community desiring to participate in river development. The statutes leave untarnished the case of C. M. & St. P. Ry. v. City of Minneapolis, 115 Minn. 460, 461, 133 N. W. 169, 51 L. R. A. (N. S.) 236, Ann. Cas. 1912D, 1029, affirmed, 232 U. S. 430, 34 S. Ct. 400, 58 L. ed. 671. The city decided to connect several lakes by means of canals which would "greatly enhance the usefulness of said lakes to the public for pleasure." The railway owned a right of way on the land between the lakes and over which it had laid its tracks long before there was any idea of building the canals. The construction of the canal and walks necessitated the building of a bridge to carry the tracks overhead. The railway claimed the right to compensation, and this was disallowed. It was urged that since the bridge was adequate and safe for railway purposes the railway company "cannot be required, by an exercise of the police power, to bear the uncompensated burden of building the bridge." It was held (115 Minn. 465, 133 N. W. 171):

"The general rule so established is that, where the safety, convenience, or welfare of the public require that a railway company carry its tracks over a public way or the public way over its tracks by a bridge, the uncompensated duty of providing such bridge devolves upon the railway company. The basis of this rule is the superior nature of the public right inherent in the reserved or police power of the state. A railroad,

though constructed first in time, is constructed subject to the implied right of the state to lay out and open new highways crossing its right of way. If the operation of the railway upon a particular surface or with a particular form of support for its tracks interferes with the public safety, convenience, or welfare in the exercise of the public right to the use of such highway, then upon the railway company is placed the burden of making such necessary and reasonable readjustment of its tracks as will permit the exercise of the superior public right."

On appeal the United States Supreme Court sustained this court and after reviewing many decisions, including State ex rel. City of Minneapolis v. St. P. M. & M. Ry. Co. 98 Minn. 380, 108 N. W. 261, 28 L. R. A. (N. S.) 298, 120 A. S. R. 581, 8 Ann. Cas. 1047, it was held that there was not a deprivation of due process of law.

Manifestly, if the police power justifies imposing the uncompensable duty to build a bridge as an original proposition, it can also be the source of the power to compel modification. This is true because the command to the railway is pursuant to an exercise of the police power which relates to the regulation of private property by the sovereign or a governmental agency thereof. Such power can never be bartered or surrendered and continues in the public although certain rights and franchises have been granted.

In C. B. & Q. Ry. Co. v. Illinois, 200 U. S. 561, 26 S. Ct. 341, 50 L. ed. 596, 4 Ann. Cas. 1175, it was held that a railroad had the uncompensable duty to modify its structures to permit the passage along a waterway of water collected by a drainage system. Among a host of other decisions supporting our conclusion is M. St. P. R. & D. Elec. Tr. Co. v. City of Minneapolis, 124 Minn. 351, 145 N. W. 609, 50 L. R. A. (N. S.) 143.

To be distinguished are cases involving municipal aid to railroads as an inducement to build the line through a particular municipality. Since there is no duty upon the railroad to direct its line through the town or city, it is a legitimate municipal

function to seek the benefit which a railroad brings to a community. Municipal aid has been upheld in this state. Davidson v. Co. Commrs. of Ramsey County, 18 Minn. 432 (482). While these cases support the proposition that a city can participate in the development of the waterway, they do not uphold the proposition that municipal funds can be used to perform a private duty.

Of course what is a public purpose is not destroyed and made private by the fact that an immediate benefit accrues incidentally to a particular group. The railroad aid cases illustrate this principle, which is premised on the proposition that the predominant public interest so outweighs the private incidental benefit that the expenditure of the public funds is justified. But in the case at bar, while the public interest would be promoted by the construction of proper clearances, the duty of the bridge owners is so apparent and performance of it so capable of being effectively compelled that for the city to undertake it would constitute the use of public funds for the benefit of the private owners. Each situation involves a balancing of public and private interests. But since the same public interest can be promoted and the public purpose achieved by assertion of the police power as would result from the use of the municipal funds, the proper method is to exert the police power. While the city can advance the general welfare by encouraging navigation within its corporate limits, in so doing it cannot expend public funds to alter the clearances, since this is beyond the purview of the general welfare power.

We find nothing in the statutes or other charter provisions which would justify the city carrying out the proposal to sell municipal bonds to raise funds to modify the bridges.

From what has been said it is evident that there is a legal duty on the part of the private owners which stands as a complete barrier to the city selling bonds to promote the purposes stated. Absent this duty on the part of the private owners, an

entirely different situation would be presented. The demurrer should not have been sustained. -.

Order reversed.

STONE, JUSTICE (concurring in the result).

To me, the result is right, for the simple reason that, under the applicable law of charter and statute, the city has no power to devote public money to the rebuilding of railroad bridges in order to adjust them to a channel change.

Feeling that to some extent the decision is put upon grounds not needing present consideration, I prefer not to express any opinion other than that just indicated. I cannot agree that decision should be put upon the distinction between private and public interest. To me, the interest to be served seems public rather than private. But until the legislature has granted to a city the power to use public money to rebuild railroad bridges, in order to make them fit a change made by federal authority, it cannot lawfully expend money for that purpose. That seems to me the whole case.