CASPER D. VISINA v. ORVILLE L. FREEMAN AND OTHERS.

89 N. W. (2d) 635.

April 11, 1958—No. 37,510.

*Butchart & Fredin,* for appellant.

*Miles Lord,* Attorney General, *Melvin J. Peterson,* Deputy Attorney General, and *Victor J. Michaelson,* Special Assistant Attorney General, for respondents governor and state auditor.

*Lawrence Yetka,* for respondent Port Authority.

*Harry E. Weinberg,* City Attorney, and *Richard L. Bye* and *Thomas J. Bujold,* Assistant City Attorneys, for respondent city.

*Thomas J. Naylor,* County Attorney, and *Ralph J. Olson,* Assistant County Attorney, for respondent county.

KNUTSON, JUSTICE.

This action was brought by plaintiff as a resident freeholder and taxpayer of the city of Duluth, county of St. Louis, and State of Minnesota, for a judgment declaring that L. 1957, cc. 648, 831, and 849, are unconstitutional for several reasons and for a declaration that such acts are void.

The case was submitted to the trial court on a stipulation of facts. The parties, on appeal, have agreed upon a statement of facts which substantially sets forth the matters which must be considered in order to dispose of the legal questions involved. In so far as there is no dispute in the statement of facts we shall adopt them for the purpose of this opinion.

Port Authority of Duluth was organized on January 24, 1930, following passage of L. 1929, c. 61. On June 2, 1955, Port Authority of Duluth was reorganized pursuant to L. 1955, c. 685, § 2, to provide for the appointment of members of Port Authority Board by the board of county commissioners of St. Louis County and by the governor of the State of Minnesota.

In anticipation of the opening of the Great Lakes-St. Lawrence water-

way that will enable oceangoing vessels to traverse the Great Lakes, our legislature, in 1957, adopted three separate acts. Chapters 648 and 831, for the most part, were amendments of existing statutory provisions codified under M. S. A. c. 458. Chapter 849 added new provisions. The portion of these acts now under attack relates to the financing of the reclamation of land and the construction of terminal port facilities by Seaway Port Authority of Duluth. While the three provisions under consideration were adopted as separate chapters, they involve a legislative plan calling for aid to a seaway port authority from the state (c. 849); from the county (c. 648); and from the city of Duluth (c. 831), in which city such seaway port is located.

Under c. 849 the state's money is to be raised upon sale of certificates of indebtedness issued in anticipation of the revenue to be derived from a special tax levied in aid of port development, the proceeds of which are to be credited to an account designated as "Minnesota Seaway Property Conservation Fund." The state contribution is granted to a seaway port authority in the discretion of the executive council on a matching basis with local funds, and state money shall be used only for the reclamation, conservation, development, and protection of the land upon which port terminal improvements are erected and not for the improvements.

Under c. 648 a county in which the county board has the right to appoint members of a seaway port authority board may issue general obligation bonds in an amount not to exceed $4,000,000 and pay the proceeds from such sale to the seaway port authority for its use in the construction of port facilities.

Under c. 831 a city in which such seaway port authority operates may issue its general obligation bonds in a sum not to exceed $1,000,000 and pay the proceeds from such sale to the seaway port authority for its use in the construction of port facilities.

By statutory definition, a port authority may be established only in cities having a population of over 50,000 inhabitants, and seaway port authorities are defined as "port authorities now or hereafter having jurisdiction over harbors located on the Great Lakes-St. Lawrence seaway system."

Only St. Louis, Lake, and Cook Counties border on the Great Lakes-

St. Lawrence Seaway System, so it follows that only municipalities in these counties could qualify under the acts involved, and of these only Duluth has a population in excess of 50,000 inhabitants; consequently, at the present time these statutory enactments could apply only to the city of Duluth.

Chapter 648 limits the right to issue general obligation bonds in aid of port development to a county in which the board of county commissioners may appoint members of a seaway port authority board. At the present time only St. Louis County could qualify under this provision.

The issuance by a city of general obligation bonds, the proceeds of which are to be used to further seaway port development, is limited by c. 831 to a city entitled to appoint members of a seaway port authority. Only the city of Duluth could qualify under this definition.

As a matter of practical operation under this plan, Seaway Port Authority of Duluth must first ascertain the type of development suited to the potential of its harbor, considering as separate problems the reclamation, conservation, protection, and development of land on the one hand and the construction of the improvements necessary for port development on the other. Not more than one-half of the total cost can be attributed to construction of port facilities, and the cost of the total development must not exceed $10,000,000 if the port authority is to take full advantage of these three legislative provisions because the state may make contribution only for the reclamation, development, protection, and conservation of land, and the total state contribution shall not exceed $5,000,000, which contribution must be matched by an equal amount derived from other sources.

In these legislative enactments the following steps have been taken:

(1) The State of Minnesota by defendant Stafford King, state auditor, has commenced levy of a tax in an amount sufficient to produce the sum of $333,333.34 for the year 1957, which is collectible in the year 1958 pursuant to the act.

(2) The board of county commissioners of St. Louis County, pursuant to a required notice, held a public hearing at which all who were interested were permitted to be heard, after which the board adopted

a resolution upon the affirmative vote of all six commissioners finding that the development of the Duluth port would inure to the benefit and welfare of the community at large; that such efforts would constitute an essential government function; and that this function could best be performed through the medium of Port Authority of Duluth. The board of county commissioners further resolved that it would consider the issuance of general obligation bonds of the county as soon as conditions precedent had been met; that is, as soon as the city of Duluth had taken the necessary steps to issue its general obligation bonds in furtherance of this development.

(3) By unanimous vote of the city council of the city of Duluth, legal proceedings have been commenced for the issuance of $1,000,000 in general obligation bonds of the city. On December 9, 1957, a resolution was adopted setting forth the terms or conditions of the proposed bond issue, the form of the bond, and the conditions of sale. The purpose stated was:

"* * * to provide funds for and to make the same available to * * * Seaway Port Authority, to pay for the purchase, construction, extension and improvement of port and terminal facilities owned and to be owned and operated by such Port Authority; * * *."

(4) Port Authority of Duluth has engaged the services of engineers and other technical experts to plan the development and erection of a port terminal in the Bay of St. Louis in Duluth Harbor; it has made a tentative order for a considerable quantity of sheet piling to be used in the reclamation of a large tract of land, partially submerged; and, as soon as money is available, Port Authority of Duluth intends to formally execute contracts for the design of port facilities and the purchase and installation of improvements. All of the money for the reclamation and protection of land and installation of port terminal facilities will be obtained from the State of Minnesota, the county of St. Louis, and the city of Duluth. The projected development of Port of Duluth calls for installation of piling in July 1958; construction of facilities as soon as land reclamation is complete; and the formal opening of the port terminal upon the opening of navigation in Lake Superior sometime in April 1959. It is contemplated that vessels from all parts of

the world will journey through the St. Lawrence Seaway and the Great Lakes to the Duluth harbor and that these vessels will be tied up and their cargo unloaded, stored at, and shipped from the terminal facilities of Port of Duluth. Railroad trackage and truck loading docks with necessary access roads will be constructed or installed for the moving of freight to and from the port facilities, and warehouses will be built for the storage and handling of this freight.

It is conceded that at this time Duluth is one of the busiest bulk shipping ports in the world. The harbor is now equipped with a number of slips, docks, and terminals, which could be used for the handling of package goods.

Upon the submission of the case on a stipulation of facts, both parties moved for summary judgment. The court granted defendants' motion and denied that of plaintiff, holding that the acts in question did not violate any of our constitutional provisions. Judgment was entered pursuant to this order, and this appeal is from that judgment.

The validity of some or all of these acts is attacked upon numerous constitutional grounds. In some cases it is claimed that all three acts violate certain constitutional provisions, and in other cases it is claimed that some of the acts are in contravention of our constitution. The nature of the claimed illegality will be stated in connection with the discussion of each of the constitutional provisions involved in these attacks.

Plaintiff contends that all three acts violate that portion of Minn. Const. art. 4, § 33, which as far as material here reads:

"* * * The legislature shall pass no local or special law * * * authorizing public taxation for a private purpose";

that part of art. 9, § 1, which reads:

"* * * Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes";

and art. 10, § 2, which reads:

"No corporations shall be formed under special acts, except for municipal purposes."

Initially, in order to determine whether there is any merit to plain-

tiff's contentions that these acts are in contravention of the above constitutional provisions, it is necessary to determine whether the establishment and operation of a port having for its purpose the improvement of a harbor and the furnishing of port terminal facilities is or may involve the performance of a governmental or public function as distinguished from one private in nature. In the determination of this question some related rules should be kept in mind.

■ It is well settled in this state that the state or its municipal subdivisions or agencies may expend public money only for a public purpose.[1] What is a "public purpose" that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.[2]

■ In determining whether an act of the state constitutes a performance of a governmental function or a public purpose which will justify the expenditure of public money, a legislative declaration of public purpose is not always controlling. The determination of what is and what is not a public purpose, or the performance of a governmental function, initially is for the legislature, but in the final analysis it must rest with the courts.[3]

■ The mere fact that some private interest may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public. The rule is clearly stated in Burns v. Essling, 156 Minn. 171, 174, 194 N. W. 404, 405, as follows:

"* * * if the primary object of an expenditure of municipal funds is to subserve a public purpose, the expenditure is legal, although it may also involve as an incident an expenditure which, standing alone,

[1]Castner v. City of Minneapolis, 92 Minn. 84, 99 N. W. 361.

[2]16 McQuillin, Municipal Corporations (3 ed.) § 44.35 (for illustrations of some public purposes, see Id. § 44.36); see, Note, 40 Minn. L. Rev. 681.

[3]Burns v. Essling, 156 Minn. 171, 194 N. W. 404; Stewart v. G. N. Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427; Arens v. Village of Rogers, 240 Minn. 386, 402, 61 N. W. (2d) 508, 519, appeal dismissed, 347 U. S. 949, 74 S. Ct. 680, 98 L. ed. 1096; 15 McQuillin, Municipal Corporations (3 ed.) § 39.19.

would not be lawful. It is equally well settled that, if the primary object is to promote some private end, the expenditure is illegal, although it may incidentally serve some public purpose also."[4]

■ Essentially, it is the contention of plaintiff that the Port of Duluth has already been built up extensively by private capital and industry and that no necessity exists for action on the part of the state, county, or city to enter this field. Quite apart from the question of what has been done in the past (and the evidence warrants a finding that up to now the port has deteriorated considerably) is the question generally as to whether the function of operating a port such as the one contemplated for the harbor at Duluth, with the prospect in the immediate future of greatly increased shipping as a result of the development and opening of the Great Lakes-St. Lawrence Seaway project, can be considered the performance of a governmental function.

Historically, the establishment and maintenance of ports, at least on the sea, intended to provide terminal facilities for shipping open to all who wish to use them, has been considered universally to be a function of government. Various forms of commissions have been set up to supervise and control port facilities, but whenever they have been engaged principally in establishing and operating an open port furnishing terminal facilities and docking privileges to all who wish to use it, subject to uniform and reasonable rules and regulations, the function has been considered to be a governmental one. The establishment and maintenance of ports in many parts of the old world are related in Commr. of Int. Rev. v. Ten Eyck (2 Cir.) 76 F. (2d) 515, a case in which the court held that the Albany (New York) Port District Commission was engaged in the performance of an essential governmental function. In an exhaustive opinion reviewing this entire matter, the court said (76 F. [2d] 518):

"* * * it is clear that ownership, control, and operation of port facilities are essentially and usually prerogatives of sovereignty; especially of the sovereignty of the constituent state governments of the United States. In England and in Scotland, the right to erect a port was

---

[4]See, also, Coates v. Campbell, 37 Minn. 498, 35 N. W. 366; 1 Cooley, Taxation (4 ed.) §§ 179 to 183.

part of the royal prerogative. No port could exist except under the authority of the sovereign."

In State of California v. Anglim (N. D. Cal.) 37 F. Supp. 663, 664, the court, following largely Denning v. State, 123 Cal. 316, 55 P. 1000, said:

"The establishment by government of ports and harbors, wherever conditions exist which render harbor development advantageous, is designed to afford a medium for the attraction and flow of commerce into and through the seaport area for the benefit and prosperity of the numerous persons necessarily affected by the resulting stimulation of industrial and trade activity in such area. In its scope and effect, port and harbor development, designed to facilitate the flow of commerce, cannot properly be classified as commerce itself, normally conducted by private industry. The importance to the general welfare, the public at large, of adequate ports and harbors for the stimulation of navigation and commerce; the fact that the development of ports and harbors has not occurred at the hands of private industry, but has remained in the reigns of government as a recognized sovereign right and duty, these considerations, in the opinion of this court, have rightfully marked the operation of ports and harbors a proper function of government."

In Cook v. Port of Portland, 20 Ore. 580, 590, 27 P. 263, 266, 13 L. R. A. 533, 537, the Oregon court said:

"* * * that anything that will cheapen the handling of what the country exports and imports will be a benefit to all, is a self-evident fact, and leaves no doubt of the public interest in this improvement."

In Port of New York Authority v. J. E. Linde Paper Co. 205 Misc. 110, 113, 127 N. Y. S. (2d) 155, 158, the court said:

"The Port Authority is an arm and agency of the States of New York and New Jersey, and in all of its activities, is engaged in the performance of essential governmental functions."

See, also, North Carolina State Ports Authority v. First-Citizens Bank & Trust Co. 242 N. C. 416, 88 S. E. (2d) 109.

In two prior cases before this court we referred to port authorities as a "municipal commission," but it must be admitted that in neither

of those cases was the constitutional question now before us presented or considered. See, State and Port Authority of St. Paul v. N. P. Ry. Co. 229 Minn. 312, 316, 39 N. W. (2d) 752, 755; State and Port Authority of St. Paul v. N. P. Ry. Co. 221 Minn. 400, 402, 22 N. W. (2d) 569, 571.

The question of whether the operation of a port constitutes the performance of a public or governmental function has arisen most frequently in connection with the right of a state, or a municipal subdivision or agency thereof, to take private property for use for docks or wharves or the improvement of a harbor under its power of eminent domain. While it has been said that no good reason is apparent why a public purpose for which property may be taken by a municipality, including the state, under the power of eminent domain should not be considered a public purpose for which a municipality may spend its money or incur an indebtedness,[5] that statement, taken generally, is too broad. "Public use," as required for the exercise of the power of eminent domain, is not necessarily synonymous with "public purpose" required for the expenditure of public money. It may be safe to assume that, if the activity constitutes a public purpose which will justify the expenditure of public money, it also constitutes a public use which will permit the exercise of the power of eminent domain, but it does not necessarily follow that, if the use to be made of the property is a public use within the meaning of our eminent domain statutes and laws, it also constitutes a public purpose for which public money may be spent. We have, for instance, frequently granted railroads and other public utilities, and even private persons,[6] the right to condemn private property for a use declared to be public, but it does not follow that public money may be spent to assist such condemnors in carrying out

---

[5] 16 McQuillin, Municipal Corporations (3 ed.) § 44.35; Carroll v. City of Cedar Falls, 221 Iowa 277, 283, 261 N. W. 652, 655, where the court said:

"* * * the taxing power of the state may be exercised *'for any object that will justify the exercise of the right of eminent domain.'*"

[6] Simmons v. N. P. R. Co. 147 Minn. 313, 180 N. W. 114 (use of railroad right-of-way for potato warehouse is a public use); Stewart v. G. N. Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427 (grain elevator public use).

the purpose for which the condemnation is permitted.[7] However, the cases relied on here, involving the right of ports or port authorities of one kind or another to condemn property, are of such a nature that the use of the term "public use" or "public purpose" authorizing condemnation is broad enough to encompass a public purpose permitting the expenditure of public money, not because it is a public use which will justify an exercise of the power of public eminent domain but, in a broader sense, because it is such a public purpose as includes, as well, the right to spend public money. To that extent the cases are helpful. The following are illustrative thereof.

In Marchant v. Baltimore, 146 Md. 513, 521, 126 A. 884, 887, the court had the following to say about the public nature of a port commission:

"* * * The development of the harbor of Baltimore according to a comprehensive plan, by which the commerce of the port will be most advantageously served, and its future growth encouraged, is a project of distinctively public interest and purpose. It is concerned with the improvement and extension of a harbor service which constitutes an essential part of a system of water transportation connecting the port of Baltimore with the markets of the world. The public character of the use to which the harbor structures are devoted is not affected by the fact that they may not all be made available for the indiscriminate use of the public. By the allocation or lease of certain docks for the separate use of persons or corporations having a regular or continuous need of such conveniences, the city does not convert into a private use the public port service which is thus in part provided. The municipal ownership is not thereby surrendered, and the use remains consistent with the public purpose for which the port accommodations as a whole are maintained."

In Moore v. Sanford, 151 Mass. 285, 290, 24 N. E. 323, 324, 7 L. R. A. 151, 153, the court was considering the validity of the taking of certain flats for the purpose of improving the harbor of Boston, and, with respect to the public nature of the improvement, said:

---

[7]Cf. Bybee v. City of Minneapolis, 208 Minn. 55, 292 N. W. 617.

"* * * That the improvement of Boston Harbor is an object of a public nature, and thus that lands taken for this purpose are taken for a public use, can hardly be controverted. It is not necessary that the entire community should directly enjoy or participate in an improvement or enterprise, in order to constitute a public use; and a benefit to the principal harbor of the Commonwealth is much more than a local advantage."

The whole matter is well summarized in 1 Dillon, Municipal Corporations (5 ed.) § 269, as follows:

"The *construction of docks and wharves by a municipality for general public use is a public purpose* which justifies the exercise of the power of eminent domain. To minister to the necessities of commerce by providing fit and proper places in a seaport where ships can be loaded and unloaded with all proper facilities, is a public duty owing by the State and through it by the municipality which governs and controls the port. * * * If a permanent pier and an exclusive right to its use be a necessity of large steamship lines, without which business cannot properly be transacted, and in the absence of which steamers will resort to other ports, then the duty rests upon the State or municipality to furnish such quarters for a fair compensation, or else the State is bound to permit the steamship companies to obtain such accommodations from private owners. Having undertaken the duty imposed upon it by the State to provide such accommodations as the interests of commerce fairly require, all appropriate acts of a city done in the performance of that duty are for a public purpose. Hence land taken for wharves is taken for a public purpose, although some portions of the land actually used may be thereafter, in the discretion of the city, divided off and placed in the exclusive possession of a lessee for the sole purpose of using it in the transaction of the necessary business connected with the loading and unloading of passengers and cargoes of ships and steamers."[8]

In the final analysis, the right of a state to establish and maintain

---

[8]See, also, 11 McQuillin, Municipal Corporations (3 ed.) § 32.64; Matter of Mayor, etc., of New York, 135 N. Y. 253, 31 N. E. 1043, 31 A. S. R. 825.

terminal port facilities is but an incident of its power to control its navigable waters. The mere fact that up until the present time private interests have developed harbor facilities at Duluth suitable and sufficient to take care of their own specialized shipping requirements does not detract from the fact that furnishing such facility for the use of all who may wish to enter the port constitutes the performance of an essential governmental function. Up until the present time, ships on the Great Lakes have been limited in size and the area in which they travel. They have not been oceangoing vessels. The evidence in this case shows that with the opening of the Great Lakes-St. Lawrence Seaway about 75 percent of all oceangoing vessels will be able to reach Duluth. The possibility of greatly increased shipping to and from all ports of the world requires little imagination. This state as a whole is vitally interested in cheaper transportation costs for those products which it is prepared to export as well as those which it wishes to import. With the opening of this waterway, Duluth will virtually become the farthest inland seaport in this country. The area useful for harbor facilities is limited, and the regulation of shipping and the proper and efficient use of terminal facilities so that they will be readily available to all who wish to use them is essential if this new traffic is to be attracted to our newly available "seaport."

While it would serve no useful purpose to discuss the many cases cited by plaintiff in which we have held that public money could not be used for a private purpose, something should be said about the cases of Behrens v. City of Minneapolis, 199 Minn. 363, 271 N. W. 814, and Bybee v. City of Minneapolis, 208 Minn. 55, 292 N. W. 617.

In the Behrens case we affirmed an order of the trial court restraining the city from authorizing an expenditure for the dredging of a portion of the Mississippi River. On first blush it would seem that this case is authority for the position taken by plaintiff, but it is clear from a reading of our opinion in that case that it is based on the fact that the purpose of the improvement was to promote the interests of a private concern, the Minneapolis Gas Light Company. We recognized the usual rule that the purpose for which public funds may be expended need not be exclusively public but held that indirect and incidental benefits which may result to the public do not make the purpose a

public one where the direct and primary object is private.

In Bybee v. City of Minneapolis, *supra,* we held that the city of Minneapolis was not authorized to issue its bonds for the purpose of building new sections of existing railroad bridges over the Mississippi River so that the channel would be navigable within the corporate limits of the city of Minneapolis. The basis of our decision in that case is (208 Minn. 56, 292 N. W. 617):

"\* \* \* if modification of the present private railroad bridges is required before commercial river traffic can proceed past them, the owners of these structures have the uncompensable and legal duty to make the requisite reasonable alterations. For the city to expend municipal funds to build proper clearances would be a use of public money to perform the duty which these private companies owe."

In both of these cases the basis of the decision is that the contemplated expenditure of public money was for a private purpose. They are not authority for the proposition that a port authority, such as we have for consideration here, is not engaged in a governmental function or a public purpose, nor are they authority for the proposition that public money may not be expended for the construction and improvement of such port facilities.

It seems clear to us, therefore, that the purposes for which the port authority is established involve the establishment of an agency of the state for the administration of a purely governmental function. As such, the argument that the acts of the legislature involved herein contravene the above constitutional provisions must fail.

■ That L. 1957, c. 849, violates Minn. Const. art. 9, § 5, which reads:

"\* \* \* The state shall never contract any debts for works of internal improvements, or be a party in carrying on such works, \* \* \*."

Plaintiff concedes that this provision of our constitution applies only to the state so that the acts of the legislature dealing with the expenditure of money by the county and city for development of the port are not involved. In Davidson v. County of Ramsey, 18 Minn. 432 at p. 443 (482 at p. 495), we so held, where we said:

"\* \* \* the prohibition is in terms expressly confined to the state,

and does not extend to cities, counties, and towns."

That interpretation of the constitution has never been altered.

Plaintiff relies for the most part on Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857. That case involved the constitutionality of L. 1893, c. 30, under which the legislature attempted to establish a terminal elevator at the Port of Duluth. We held that the act was violative of Minn. Const. art. 9, § 5. In so doing we held that the term "internal improvements" included any "public improvements." However, we recognized an exception to the constitutional proscription when dealing with activities pertaining to proper governmental functions. In that respect we said (56 Minn. 113, 57 N. W. 334, 22 L. R. A. 861):

"* * * it was not supposed that it was proper or competent for the state to embark in any public improvements, *except such as strictly pertained to its proper governmental functions.*" (Italics supplied.)

That interpretation of this constitutional provision has been followed consistently since that time. State ex rel. Smith v. Van Reed, 125 Minn. 194, 145 N. W. 967; Note, 6 Ann. Cas. 307; Lipinski v. Gould, 173 Minn. 559, 218 N. W. 123, 730.

Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, involved the constitutionality of L. 1943, c. 500, authorizing the creation of a Metropolitan Airports Commission. The arguments advanced by plaintiff in this case are identical in many respects with those upon which the constitutionality of that act was attacked. With respect to Minn. Const. art. 9, § 5, we said (218 Minn. 102, 15 N. W. [2d] 203):

"The principal challenge to the constitutionality of the act is that thereby the state contracts a debt for works of internal improvement and becomes a party to the carrying on of such works in contravention of Minn. Const. art. 9, § 5. This provision of the constitution has been consistently held by this court not to apply to works which are used by the state as a sovereign in the performance of its governmental functions."

Our former decisions holding that this provision of our constitution does not apply to works of the state used in the performance of a governmental function are sufficient to dispose of this question in view

of our determination that the port authority involved here is engaged in the performance of a governmental function, but there are other reasons why the act should not be held in contravention of this constitutional provision. Where one construction of a statute will make it void for conflicting with our constitution and another will render it valid, the latter, if not a forced and unreasonable one, will be adopted.[9]

While the plain meaning of language used in our fundamental law may not be tampered with to accomplish a desired result no matter how archaic it has become by virtue of social and economic changes which have occurred since its adoption, neither should the proper interpretation of constitutional provisions ignore such changes. In determining whether an act of the legislature contravenes a constitutional provision we should endeavor to interpret the provision in the light of existing conditions, particularly when those conditions could not have been foreseen at the time the constitution was adopted. If the Great Lakes-St. Lawrence Seaway had been a reality instead of a dream when our constitution was adopted, it can hardly be supposed that the framers of our constitution, and the people who adopted it, would have proscribed the expenditure of public money to improve harbor and dock facilities to enable our state to have contact by water transportation with all other ports of the world. The limitation on spending public money for internal improvements obviously was not intended to circumscribe such activity. In a true sense, the development of a seaport to facilitate water transportation between our state and other ports of the world is not an internal improvement at all. While we held that the term "internal improvements" includes any public improvement in Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L. R. A. 857, it must be kept in mind that, in discussing the term, we did not there have in mind any such thing as the development of a seaport. It seems to us that such improvement could not have been within the contemplated meaning of this constitutional proscription, nor would it be proper to so construe the constitution as to include it within the meaning of "internal improvements."

---

[9]Stewart v. G. N. Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427; Hassler v. Engberg, 233 Minn. 487, 499, 48 N. W. (2d) 343, 352.

While this case may illustrate the need for some constitutional revision, the fact remains that the right to amend the constitution rests with the people and should not be usurped by the courts in the guise of judicial interpretation. At the same time, when it becomes necessary to interpret the provisions of the constitution in the light of conditions which exist today that could not be contemplated at the time our constitution was adopted, we should attempt to give to it a reasonable meaning as applied to present conditions if that can be done without doing violence to the expressed language used in the constitution itself. If the language of the constitution permits, we should give to it that meaning which would have been expressed when adopted if the present conditions that are involved had then existed or had been within the contemplation of those who drafted the instrument.

For these reasons, we conclude that c. 849 does not violate Minn. Const. art. 9, § 5.

■ That the act in question contravenes Minn. Const. art. 9, § 10, which reads:

"The credit of the State shall never be given or loaned in aid of any individual, association or corporation, * * *."

We have heretofore held that this provision applies only to the state. Davidson v. County of Ramsey, 18 Minn. 432 (482).

It is the contention of plaintiff that the Port of Duluth will be improved at the expense of the public for the benefit and convenience of shipping companies, railroads, truckers, importers, exporters, and other shippers. It can hardly be denied that those who use the port will derive some incidental benefit from it. However, the fact that some private interests may derive some incidental benefit from the development and operation of the port does not deprive the port authority of its public character. As we have stated above, it is the primary purpose which controls. If it is engaged in a governmental function or public purpose, it does not matter that some private interests may derive some incidental benefit from the operation of the authority. Here, the primary purpose is to facilitate and encourage the development of shipping to and from the port and to control the orderly use of the port and its facilities so that it will be open and available to all who

wish to use the port. The incidental benefit which may come to shippers has never been held to deprive such port of its public nature, and neither does it come within the prohibition of the above constitutional provision.

■ That they violate Minn. Const. art. 9, § 1, which reads:

"The power of taxation shall never be surrendered, suspended or contracted away. Taxes shall be uniform upon the same class of sub·jects, and shall be levied and collected for public purposes, * * *."

The portion of this constitutional provision which plaintiff contends is violated is that which reads: "Taxes shall be uniform upon the same class of subjects." The argument here is that the state is imposing a tax on portions of its people which derive no benefit from the improvement financed by such tax.

Absolute equality of taxation is never attained. In all segments of the population there are those who must pay taxes for a purpose from which, it might be argued, they derive no direct benefit. But absolute equality has never been required. If there is a reasonable relationship to the apportionment of the taxes and the benefit to be derived by that segment of our population required to bear the financial burden, it lies within the province of the legislature to make such apportionment.[10] Here it has been determined that Duluth will benefit to the greatest extent. Its per capita burden is the greatest. It is reasonable to suppose that the residents of St. Louis County will next benefit the most from the improvement. Its per capita burden is next highest; and last, it is reasonable to believe that the state as a whole will benefit to some extent from the increased traffic and availability of cheaper transportation for the products which it exports and imports. We think that the financial apportionment provided by the legislature bears a reasonable relationship to the benefits which can be anticipated. Having further determined that the activities of the port authority constitute a public purpose and the performance of a governmental function, we find no violation of this constitutional provision.

■ That these acts contravene that portion of Minn. Const. art. 4, § 33, which reads:

[10]Cook v. Port of Portland, 20 Ore. 580, 27 P. 263, 13 L. R. A. 533; see, Dimke v. Finke, 209 Minn. 29, 295 N. W. 75, 25 Minn. L. Rev. 520.

"In all cases when a general law can be made applicable, no special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined without regard to any legislative assertion on that subject."

This provision of our constitution has been the source of much litigation.[11] It is fruitless to try to harmonize or reconcile the numerous decisions involving the application of this question to varying factual situations.[12]

In State v. Cloudy & Traverse, 159 Minn. 200, 203, 198 N. W. 457, 458, we said:

"* * * That entire harmony or logical consistency should exist in the application of so general a constitutional provision to so many particular instances is not to be expected."

The best that can be done is to ascertain if the facts in the case before us come within the general requirements of the provision of our constitution as construed by our decisions.

The first case to come before this court after the adoption of the above section as an amendment to our constitution was State ex rel. Bd. of Courthouse, etc. Commrs. v. Cooley, 56 Minn. 540, 58 N. W. 150. In that case we established certain rules to determine if a statute violated the above constitutional provision, which rules have since been followed. These rules were summarized in Hamlin v. Ladd, 217 Minn. 249, 252, 253, 14 N. W. (2d) 396, 399, as follows:

(1) A law is general when it is uniform in its operation even though it divides the subjects of its operation into classes and applies different rules to different classes. It need not operate alike upon all the inhabitants of the state, or all the cities, or all the villages in the state.

(2) A law is general in the constitutional sense which applies to and

---

[11]See, 3 Dunnell, Dig. (3 ed.) § 1676, et seq. For a history of this provision, see Leighton v. City of Minneapolis, 222 Minn. 516, 25 N. W. (2d) 263.

[12]Compare majority and dissenting opinions in State v. Cloudy & Traverse, 159 Minn. 200, 198 N. W. 457.

operates uniformly upon all members of any class of persons, places, or things requiring legislation peculiar to itself in matters covered by the law.

(3) A special law is one which relates and applies to particular members of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable.

(4) The classification must be based upon "substantial distinctions" —those which make one class really different from another. The distinction must be based "upon some natural reason,—some reason suggested by necessity, by some difference in the situation and circumstances of the subjects placed in the different classes, suggesting the necessity of different legislation with respect to them."

(5) The classification must be germane to the purpose of the law; that is, there must be an evident connection between the distinctive features to be regulated and the regulations adopted.

(6) To whatever class the law applies, it must apply to every member of that class; that is to say, it must treat all alike who are similarly situated; "all who are brought within its influence, but in its classification it must bring within its influence all who are under the same conditions."

(7) One alone may constitute a class as well as many, but the fewer there are in a class the more closely will courts scrutinize an act to see if its classification constitutes an evasion of the constitution.

From State ex rel. Bd. of Courthouse, etc. Commrs. v. Cooley, *supra,* have come certain rules adopted as guides to construction in determining whether a statute contravenes this constitutional provision that are particularly applicable here. In the first place, it is recognized that the legislature has the power to classify subjects for legislation,[13] and the courts will not interfere with such classification unless it is so manifestly arbitrary as to evince a legislative purpose of evading the constitution.[14]

[13]Nichols v. Walter, 37 Minn. 264, 33 N. W. 800; Wall v. County of St. Louis, 105 Minn. 403, 117 N. W. 611.

[14]State ex rel. Anderson v. Sullivan, 72 Minn. 126, 75 N. W. 8; State ex rel. Douglas v. Westfall, 85 Minn. 437, 89 N. W. 175, 57 L. R. A. 297;

The fact that there is now only one subject in the class is not decisive.[15] If the statute is so framed as to apply to other municipalities as they acquire characteristics of the class designated, it usually is held to be general rather than special.[16]

It must be conceded that at the present time the port at Duluth is the only one that can come within the legislative acts involved. However, that does not invalidate the acts.[17] Other ports on the Great Lakes may in time qualify under the acts. In State ex rel. Bd. of Courthouse, etc. Commrs. v. Cooley, 56 Minn. 540, 552, 58 N. W. 150, 154, we said:

"* * * The mere fact that there is only one city, and there may never be another, having the requisite population to belong to a class, will not render the law special. The last proposition to which we will refer is that the character of an act as general or special depends on its substance, and not on its form. It may be special in fact, although general in form; and it may be general in fact, although special in form. The mere form is not material. To illustrate, suppose mountains were one of the subjects on which special legislation was prohibited, and that there was only one mountain in the state; a law referring to that mountain by name would be special in form, but general in fact, according to all the rules.

"Or suppose that special legislation was prohibited with reference to the police regulation of the shores of the great lakes; would it be claimed that a law was special in fact because, by its terms, it applied only to Lake Superior? Or would it be any less general because, by its terms, its operation was limited to the counties of St. Louis, Lake, and Cook? Most certainly not."

State ex rel. Flaten v. Independent School Dist. 143 Minn. 433, 174 N. W. 414.

[15]State ex rel. Flaten v. Independent School Dist. 143 Minn. 433, 174 N. W. 414; State ex rel. Anderson v. Sullivan, 72 Minn. 126, 75 N. W. 8; Town of Bridgie v. County of Koochiching, 227 Minn. 320, 35 N. W. (2d) 537; but see, Roe v. City of Duluth, 153 Minn. 68, 189 N. W. 429.

[16]State ex rel. Flaten v. Independent School Dist. supra; State ex rel. Roche v. Rogers, 97 Minn. 322, 106 N. W. 345.

[17]See, Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241.

We think that there is a reasonable relationship between the classification and the subject matter of the legislation. It follows that the classification was within the legislative discretion; hence that it is not special legislation within the meaning of Minn. Const. art. 4, § 33.

■ That c. 849 is in violation of that part of Minn. Const. art. 9, § 5, which reads:

"For the purpose of defraying extraordinary expenditures, the state may contract public debts, but such debts shall never, in the aggregate, exceed two hundred and fifty thousand dollars; * * *."

Plaintiff concedes that this proposition has been decided adversely to this contention in Fleckten v. Lamberton, 69 Minn. 187, 72 N. W. 65; Brown v. Ringdal, 109 Minn. 6, 122 N. W. 469; Moses v. Olson, 192 Minn. 173, 255 N. W. 617; and Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201, but argues that the effect of these decisions is to circumvent the clear intent of the constitution and therefore they should not be followed. The type of financing involved here is indistinguishable from that involved in the above cases. That such financing does not contravene the above constitutional limitation is now too well settled to require further discussion. We see no need of repeating what has been formerly said in these prior decisions. They are controlling on the proposition that c. 849 does not violate the quoted portion of art. 9, § 5.

■ Next plaintiff contends that the transfer of money by the state, county, and city to the Seaway Port Authority of Duluth constitutes an unlawful delegation of legislative power in violation of Minn. Const. art. 3, in that public money is thereby diverted to an autonomous agency not under the responsible control of elected officials. Plaintiff again concedes that this question has been answered adversely to him in State ex rel. Anoka County Committee v. Metropolitan Airports Comm. 248 Minn. 134, 78 N. W. (2d) 722.

It is well settled that, while the legislature may not delegate legislative power, it may delegate legislative functions which are merely administrative or executive in carrying out the mandate of the legislature as provided by law. The legislature has a large discretion in determining

by what agency its laws are to be administered.[18] A public corporation engaged in performing a sovereign legislative function acts as an arm of the state.[19] There is no essential difference between the functions to be performed by the port authority involved in the acts of the legislature now before us and those to be performed by the Metropolitan Airports Commission, the constitutionality of which has heretofore been upheld.[20]

In Berman v. Minnesota State Agricultural Society, 93 Minn. 125, 127, 100 N. W. 732, we said:

"* * * The state may and must commit the discharge of its sovereign political functions to agencies selected by it for that purpose. Such agencies, while engaged exclusively in the discharge of such public duties, do not act in any private capacity, but stand in the place of the state, and exercise its political authority."

In State ex rel. Interstate, etc. v. Metropolitan Airports Comm. 223 Minn. 175, 190, 25 N. W. (2d) 718, 728, the difference in the delegation of legislative power and legislative function was said to be that "the one involves the power to make law; the other requires action prescribed by law."

We find no unconstitutional delegation of power here.

Finally, plaintiff contends that cc. 648 and 831 do not meet the constitutional requirements of Minn. Const. art. 4, § 27, which reads:

"No law shall embrace more than one subject, which shall be expressed in its title."

The title of c. 648 reads:

"An act relating to port authorities, authorizing county tax levies and bonds in aid of seaway port development and amending Minnesota

---

[18]See, 3 Dunnell, Dig. (3 ed.) § 1600; Hassler v. Engberg, 233 Minn. 487, 516, 48 N. W. (2d) 343, 360.

[19]Barmel v. Minneapolis-St. Paul Sanitary Dist. 201 Minn. 622, 277 N. W. 208.

[20]Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201; Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241.

Statutes 1953, Section 458.14, as amended."

The title of c. 831 reads:

"An act relating to port authority commissions, amending Minnesota Statutes 1953, Sections 458.09, 458.11, and 458.15."

We have frequently held that this provision of our constitution should be given a liberal construction.[21]

In Johnson v. Harrison, 47 Minn. 575, 577, 50 N. W. 923, 924, 28 A. S. R. 382, 384, we established the applicable rule, since followed in construing this constitutional provision, where we said:

"* * * All that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject."

In State ex rel. Pearson v. Probate Court, 205 Minn. 545, 551, 287 N. W. 297, 300, we said:

"The objects of the constitutional provision have been often expressed in the decisions of this court. They are, first, to prevent 'log-rolling legislation' or 'omnibus bills,' by which a large number of different and disconnected subjects are united in one bill and then carried through by a combination of interests; and, secondly, to prevent surprise and fraud upon the people and the legislature by including provisions in a bill whose title gives no intimation of the proposed legislation, or of the interests affected."

Plaintiff concedes that the title of c. 849 is adequate but claims that c. 831 in particular must fall (1) because it contains more than one subject, and (2) because the subject is not adequately set forth in the title of the bill. We think that, under the rules stated in our prior de-

---

[21]State v. Gut, 13 Minn. 315 (341); State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N. W. 297, affirmed, 309 U. S. 270, 60 S. Ct. 523, 84 L. ed. 744, 126 A. L. R. 530; C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 297 N. W. 9.

cisions, the title meets the requisite test.[22]

We have frequently held that the title of a bill is not intended to be an index of the bill. In C. Thomas Stores Sales System, Inc. v. Spaeth, 209 Minn. 504, 509, 297 N. W. 9, 13, we said:

"The subject of a statute is the matter to which it relates and with which it deals. A subject embraces all provisions which are germane to it; they may be parts of it, incident to it, or means auxiliary to the end in view. The subject must be single; the provisions by which the object is accomplished may be multifarious. The constitutional provision ought to be practically and liberally construed."

Tested by these rules, we think that the titles are sufficient. Chapters 648 and 831 are mainly amendments of existing laws. While the three acts were passed as separate bills, they were enacted more or less as a single package. It is hard to believe that any member of the legislature was misled by the title of any one of these acts. Tested by the above rules, we think that the titles sufficiently meet the constitutional requirements.

We find no objection to any of the three acts involved on any constitutional ground raised by plaintiff.

Affirmed.

---

[22]See, for instance, State ex rel. Olson v. Erickson, 125 Minn. 238, 146 N. W. 364; Sverkerson v. City of Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944.