J.L. SHIELY COMPANY, Respondent,

v.

COUNTY OF STEARNS, Relator,

and

Hubert H. Humphrey, III, Attorney General of the State of Minnesota, Respondent.

No. CO–86–416.

Supreme Court of Minnesota.

Nov. 7, 1986.

Gerald W. Von Korff, St. Cloud, for relator.

David S. Doty, Minneapolis, for J.L. Shiely.

Linda F. Close, Deputy Atty. Gen., St. Paul, for Hubert H. Humphrey, III.

COYNE, Justice.

We review on certiorari the decision of the tax court declaring unconstitutional Minn.Stat. § 298.75 (1984) which requires Stearns County and 21 other counties to impose a production tax on the removal of aggregate material. The tax court ordered refund of the aggregate production tax in the amount of $39,017.28 paid under protest by J.L. Shiely Company for the quarter ending September 30, 1984, with interest from the date of payment. We reverse.

The production tax on the removal of aggregate materials originated in a series of special laws enacted between 1961 and 1979 which authorized seven counties along the North Dakota border to impose a tax on the production of aggregate material. *See e.g.,* Act of April 20, 1961, ch. 605, 1961 Minn.Laws 1105. The tax was intended to provide funds for the maintenance of local roads and bridges subjected to heavy use by North Dakota gravel haulers, who paid neither fuel taxes nor license fees in Minnesota.

In 1980 the special laws were superseded by a general law which permitted all counties to impose the tax. Act of April 23, 1980, ch. 607, art. 19, § 5, 1980 Minn.Laws 1333. The revenues collected were to be deposited in county and township road and bridge funds and a fund for the reclamation of abandoned pits and quarries. Some counties imposed the tax, but some did not. The aggregate industry's complaints of disparate treatment prompted the 1982 amendment of the statute making imposition of the tax mandatory in all counties in which the annual aggregate production exceeded 20,000 tons. Act of March 22, 1982, ch. 523, art. 13, § 1, 1982 Minn.Laws 818.

The counties, however, did not unanimously favor the mandatory tax, and in 1983 the statute was again amended. The legislature first polled county officials to determine local preferences. Some counties, particularly those in which aggregate production was high, wanted authority to impose the tax in order to fund repair of roads damaged by the passage of loaded gravel trucks. Other counties opposed the tax on the ground that the revenue produced did not justify the cost of collection, especially since much of the aggregate produced is purchased by governmental units. References to local choices are scattered throughout the House Tax Committee hearings. In general, the preferences of the various counties, tempered by some regional considerations, appear to have been the decisive factor in the legislative deliberations, which resulted in the redefinition of "county" to include only 26 named counties.[1] Act of June 14, 1983, ch. 342, art. 14, § 1, 1983 Minn.Laws 2312. The area in which the removal of aggregate materials was taxed extended from Kittson County in the north, southerly through the Red River Valley to Big Stone County, then easterly

[1]. The named counties are Stearns, Benton, Sherburne, Wright, Carver, Scott, Dakota, Le Sueur, Kittson, Marshall, Pennington, Red Lake, Polk, Norman, Mahnomen, Clay, Becker, Wilkin, Traverse, Big Stone, Stevens, Pope, Anoka, Hennepin, Washington, and Ramsey. Minn. Stat. § 298.75 (1983 Supp.).

through the St. Cloud and Twin City metropolitan areas to the St. Croix River, with Le Sueur as the most southerly of this "L" shaped block of counties.

Once again, in 1984, the legislature responded to expressions of local preference by amending section 298.75: five counties —Traverse, Stevens, Pope, Wright, and Anoka—were deleted from and one—Sibley—was included in the list of counties required to impose the aggregate production tax, and Stearns and Benton Counties were accorded the option of exempting from the tax aggregate used in governmental projects. Act of May 2, 1984, ch. 652, §§ 1, 2, 1984 Minn.Laws 1901.

During the legislative hearings in both 1983 and 1984 the tri-county St. Cloud area was the subject of special attention. Sherburne County pressed forcefully for authority to impose the tax because Elk River had rezoned certain lands in the expectation of the continued extraction of large amounts of aggregate and the county had anticipated the tax revenue in setting its budget. Stearns and Benton did not favor the tax, but neither did they make any strong objection. Expressing concern that operators in Sherburne County would be placed at a competitive disadvantage in the St. Cloud market unless the tri-county area was treated as an economic unit, the legislature included Stearns and Benton as well as Sherburne in the list of taxing counties in the 1983 enactment. In 1984 the legislature responded to the increasingly vocal opposition of Stearns and Benton Counties by permitting them to elect not to impose the tax on aggregate sold to governmental entities or used in governmental projects.

Following the 1984 amendment of section 298.75, the taxing counties were no longer contiguous and the "L" shaped block became four distinct parcels. The withdrawal of Traverse, Stevens, and Pope Counties

left a discrete ten-county block along the Red River Valley and isolated Big Stone County. With the deletion of Wright and Anoka Counties, the tri-county St. Cloud area and the Twin Cities metropolitan area appear as distinct parcels despite the short common boundary between Sherburne and Hennepin Counties.

Shiely contends and the tax court ruled that the 1983 and 1984 enactments are violative of the uniformity clause of the Minnesota Constitution [2] and the equal protection clauses of both state and federal constitutions.[3] Because the scope of their restrictions on the legislative power to tax and to classify is identical, these constitutional principles will be discussed together. *AFSCME Councils 6, 14, 65 and 96 v. Sundquist,* 338 N.W.2d 560, 569 n. 11 (Minn.1983); *Rio Vista Non-Profit Housing Corp. v. Ramsey County,* 335 N.W.2d 242, 245 (Minn.1983), *appeal dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

Differential regulation of certain geographical areas of a state by its legislature was first addressed by the United States Supreme Court in *Missouri v. Lewis,* 101 U.S. (11 Otto) 22, 25 L.Ed. 989 (1879). In upholding the constitutionality of a statute which directed appeals from certain counties to an intermediate appellate court while permitting those from other counties to be heard by the state supreme court, the Court stated that the equal protection clause was not intended to address "local and municipal regulations that do not injuriously affect or discriminate between persons or classes of persons within the places or municipalities for which such regulations are made." *Id.* at 30.

More recently the Supreme Court again faced the issue of geographical discrimination in *Salsburg v. Maryland,* 346 U.S. 545,

---

**2.** Article 10, § 1 of the Minnesota Constitution provides, "Taxes shall be uniform upon the same class of subjects...."

**3.** The 14th Amendment of the United States Constitution, at section 1, provides in part: "No state shall ... deny to any person within its jurisdiction the equal protection of the laws."

The Minnesota Constitution includes a similar principle: "No member of this state shall be disenfranchised or deprived of any of the rights and privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers...." Minn. Const., art. I, § 2.

74 S.Ct. 280, 98 L.Ed. 281 (1954). A Maryland statute allowed the admission of illegally seized evidence in certain misdemeanor prosecutions in some counties but required its exclusion in like prosecutions in other counties. Citing *Lewis,* the Court reiterated the rule that territorial discrimination alone does not violate the equal protection clause and then added this rationale for the rule: Maryland could have validly granted home rule to each county and have left it to each county to decide on its own rule of evidence. The desirability of centrally enacted legislation designed to meet the needs and expressed wishes of the affected localities is a matter for legislative discretion, not judicial supervision, except where there is a clear conflict with constitutional limitations.

Because *Salsburg* was decided some years before the exclusionary rule was extended to state prosecutions, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), there was no underlying federal right at issue. In *Reeder v. Kansas City Bd. of Police Comm'rs,* 796 F.2d 1050 (8th Cir.1986), however, the United States Court of Appeals analyzed a Missouri statute which does involve an underlying federal right: the statute prohibits members of the Kansas City police force from participating in or contributing money to political causes or campaigns. It was held that under Supreme Court precedents a statute which discriminates between the political subdivisions of a state does not offend the equal protection clause. As long as the statute treats all persons within its jurisdictional limits the same, there is no ground for an equal protection challenge.

Interestingly enough, while declaring that geographical distinctions are simply not subject to equal protection analysis, both the Supreme Court and the Eighth Circuit Court went on to hold that the distinction was not irrational. *Salsburg,* 346 U.S. at 550–51, 81 S.Ct. at 1688–89; *Reeder,* 796 F.2d at 1053. Implicit in other cases involving geographical distinctions is the determination that there was a rational basis for the geographical classification. *See e.g., North v. Russell,* 427 U.S. 328,

338–39, 96 S.Ct. 2709, 2714, 49 L.Ed.2d 534 (1976) (discussion of reasons for distinctions in statute providing for lay judges in some cities and law-trained judges in others); *Fort Smith Light & Traction Co. v. Bd. of Improvement of Paving District No. 16 of the City of Fort Smith,* 274 U.S. 387, 391–92, 47 S.Ct. 595, 597, 71 L.Ed. 1112 (1927) (statute requiring one railway company to pave its abandoned trackage upheld because road involved was sufficiently different from others).

■ When judging the constitutionality of a statute singling out one geographical area for differential treatment, Minnesota has adhered to the general rule that there must be some rational basis for the distinction. *See City of Winona v. Policeman's Relief Ass'n,* 281 N.W.2d 145, 148 (Minn. 1979) (statute requiring one city to make payments to retirement association for benefit of police chief); *Leighton v. City of Minneapolis,* 222 Minn. 516, 521–23, 25 N.W.2d 263, 266 (1946) (statute authorizing special property tax levy in state's largest city). Whenever the legislature has exempted areas within a taxing district, we have required a reasonable basis for the exclusion. *Lifteau v. Metropolitan Sports Facilities Comm'n,* 270 N.W.2d 749, 755 (Minn.1978) (certain cities partly within metropolitan area exempted from stadium tax in order to avoid inequality of tax burden on competitors within the exempted cities); *Visina v. Freeman,* 252 Minn. 177, 195, 89 N.W.2d 635, 650 (1958) (tax to support Duluth Port Authority limited to areas of St. Louis County particularly benefitted); *Maltby v. Taugtes,* 50 Minn. 248, 52 N.W. 858 (1892), and *Guilder v. Otsego,* 20 Minn. 74 (Gil 59, 63–64) (1874) (tax to fund construction of new bridge limited to townships particularly benefitted). The principle applies in the converse situation as well. An area benefitted by a local property tax must be included in the taxing district unless there is a rational basis for its exclusion. *State v. Scott County,* 195 Minn. 111, 117, 261 N.W. 863, 865–66 (1935) (statute exempting certain cities from tax to maintain county roads); *Minnesota Lin-*

*seed Oil Co. v. Palmer*, 20 Minn. 468 (Gil 424, 430) (1874) (tax for benefit of entire block assessed on only part of block).[4]

■ We are of the opinion that the differing needs and preferences of the counties, coupled with the avoidance of adverse effects upon competition within an economic unit such as the tri-county St. Cloud area, and the regional characteristics of the aggregate industry afford a rational basis for the 1983 and 1984 legislation codified as Minn.Stat. § 298.75. *Rio Vista Non-Profit Housing Corp. v. Ramsey County*, 335 N.W.2d 242, 245 (Minn.1983). As the Court pointed out in *Salsburg*, the enactment of state legislation designed to meet the needs and desires of each county may be more cumbersome than simply giving the counties local option, but it is not constitutionally unsound. Moreover, we have previously recognized the rationality of preventing the unequal treatment of competitors within a geographical area. *Lifteau v. Metropolitan Sports Facilities Comm'n*, 270 N.W.2d 749, 755 (Minn.1978). Finally, the areas in which the tax is imposed—the Red River Valley, the tri-county St. Cloud area, and the Twin City metropolitan area—are three of the regions of highest aggregate production in the state. Although there are other areas of relatively high aggregate production, aggregate production in the areas in which the tax is imposed presents particular problems. The damage resulting from transporting aggregate over Red River Valley roads provided the original impetus for the aggregate production tax. The intensity of production in the vicinity of Elk River has significantly affected city planning and has imposed substantial road maintenance burdens. That demand for aggregate is highest in urban areas and that the high cost of transporting aggregate intensifies the production and depletes the deposits of aggregate materials near urban centers seems to us a not irrational basis for inclusion of the Twin City metropolitan area.

■ Shiely also contends that section 298.75 is a special law which is invalid because not submitted for local approval. It is quite clear, however, that although section 298.75 is a special law, local approval of the 1983 enactment was not required because the 26 counties to which it applied were contiguous counties with a population in excess of 1,000,000 people. Minn.Stat. § 645.023, subd. 1 (1984). Hence, the 1983 act became effective without local approval. Although it may well be that the 1984 amendment never became effective because the six affected counties failed to file certificates of approval pursuant to Minn. Stat. § 645.021, subd. 3 (1984), the failure to certify local approval simply renders the law ineffective, not unconstitutional. *Rush City Hosp. v. Sandstone Area Hosp.*, 326 N.W.2d 638, 640 (Minn.1982). If the 1984 amendment did not become effective, the 1983 enactment, which required imposition of the production tax on the removal of aggregate materials from sites in Stearns County, remained in effect.

■ Finally, Shiely asserts that the 1983 repeal of the statewide mandatory tax and passage of a special law providing for imposition of the tax by 26 designated counties was an unconstitutional enactment of a special law exempting property from taxation. Minn.Const. art. 12, § 1. Minn.Stat. § 298.75 (1984) does not exempt property from taxation. Like any special law authorizing the imposition of local taxes, section 298.75 is geographically oriented; but that fact does not render it unconstitutional. *Cf. Visina v. Freeman*, 252 Minn. 177, 195, 89 N.W.2d 635, 650 (1958). Within the named counties to which its mandate applies section 298.75 provides no exemption. Rather the statute requires those counties

4. In other states the validity of geographical classifications has depended on whether the classification was reasonably related to the purpose of the statute. Compare *Kendzior v. Kusper*, 118 Ill.App.3d 83, 73 Ill.Dec. 821, 454 N.E.2d 1070 (1983) (rational basis for valid statute allowing certain taxing districts to exclude debt service levies in computing aggregate levies); *Board of Commissioners v. Board of Trustees*, 325 N.E.2d 482, 484, *aff'd*, 263 Ind. 694, 338 N.E.2d 257 (1975) (rational basis use), with *Atlanta v. Gower*, 216 Ga. 368, 116 S.E.2d 738 (1960) (statute authorizing taxes on professions within certain cities invalid).

to impose on *every* operator or importer a production or excise tax measured by the amount of aggregate material removed.

Reversed.